ALEXANDER MURRAY et al.

*v.*

THE BEATTIE MANUFACTURING COMPANY et al.

[Decided March 27th, 1911.]

1. The defendant corporation, the Beattie Manufacturing Company, which was incorporated by certificate filed June 17th, 1882, under the General Corporation act of 1875 (*Rev. Stat. p. 186*), is not a manufacturing corporation within the meaning of section 52 of that act, and for that reason, after reserving as a working capital a sum to be specified by the directors not exceeding one-half of the capital stock, compelled to declare a dividend of the whole accumulated profits, as appears from a

*9 Buch.*          Murray *v.* Beattie Manufacturing Co.

consideration of the objects of the corporation as specified in its certificate and then ascertaining what kind of business the corporation actually embarked in.

2. The history of the legislation in this state looking toward the compulsory distribution of the profits of corporate business by dividends to the stockholders, reviewed and considered in its application to the defendant corporation.

3. If the defendant corporation must be deemed to be a manufacturing corporation within the meaning of the act of 1875, that act was repealed and substituted by subsequent laws which the legislature had the constitutional right to pass.

4. Under the by-laws of the defendant corporation and the present General Corporation act as amended in 1901, the whole matter of distributing profits as dividends is within the sound discretion of the directors.

5. The defendant is an incorporated manufacturing partnership having no securities in the market and no interest in the maintenance of regular dividends on its stock, which was held exclusively by members of the Beattie family. The majority stockholders were the directors and also the holders in trust of a large part of the minority stock, the dividends on which went to three women for life while the managers and trustees and their children had a large reversionary interest in the stock so held in trust by them on the decease of the female beneficiaries. —*Held*, that the personal advantage of the managers and trustees in keeping the accumulated profits undistributed as dividends, upon a slight showing of unfairness, might justify intervention by a court of equity to compel distribution in dividends, and that the managers had no right to keep back a distribution of profits in dividends in order to secure uniform and stated incomes to the three women,—that they were not charged with any such duty.

6. Upon a bill filed by the stockholders of said corporation—(1) to compel the distribution of accumulated profits by dividends to stockholders, and (2) to compel restoration to the company of moneys received by officers as salaries in excess of the value of the services rendered—*Held*, after a consideration of the evidence, first, that the complainants when they filed their bill were entitled to a compulsory dividend distributing a very substantial amount of accumulated profits: and secondly, that the annual salaries of the defendant officers ($8,500 each) are not excessive, but, on the contrary, in view of all the facts and circumstances of the case, so far as they are disclosed by the evidence, are fair and reasonable.

Bill filed by stockholders of the Beattie Manufacturing Company, (1) to compel the distribution of accumulated profits by dividends to stockholders, and (2) to compel restoration to the company of moneys received by officers as salaries in excess of the value of the services rendered.

*Mr. John B. Humphreys* and *Mr. John W. Harding,* for the complainants.

*Mr. Gilbert Collins,* for the defendants.

STEVENSON, V. C.

My conclusion is that the complainants when they filed their bill were entitled to a compulsory dividend distributing a very substantial amount of accumulated profits.

My further conclusion is that the salaries of the defendants Robert Beattie and William H. Beattie ($8,500 each) are not excessive, but on the contrary in view of all the facts and circumstances of the case, so far as they are disclosed by the evidence, are fair and reasonable.

1. The defendant corporation, the Beattie Manufacturing Company, was incorporated by certificate filed under the General Corporation act of 1875, June 27th, 1882. For many years prior to that date, Robert Beattie had been operating a carpet manufactory, at Little Falls, on the Passaic river, where from time to time he acquired tracts of lands until apparently the entire water power of the river at that place was owned or controlled by him. Two sons, Robert Beattie, the defendant, and William Beattie, now deceased, were associated with their father in the manufacturing business upon an indefinite partnership arrangement. On April 19th, 1879, Robert Beattie and his two sons made a written partnership agreement in which it is recited that the father and sons had

"for several years been in partnership under the name of Robert Beattie & Sons, in the manufacturing business and without any definite agreement as to the respective interest of each in said business,"

and further recited that the written agreement was made to settle the interests of the parties and to provide for a continuance of the business. The significant fact is that the parties took as a basis of settlement a statement of assets and liabilities made January 1st, 1879, showing a net surplus of just $140,000. The partnership assets included machinery, stock and bills re-

ceivable, and the agreement sets forth that it was "conceded that the ownership of all the real estate is in Robert Beattie."

When the partners proceeded in June, 1882, to create a corporation to take the manufacturing business of Robert Beattie & Sons, and also to take the very large interests of Robert Beattie in real estate and water privileges at Little Falls, the manufacturing business appears to have been turned over to the corporation at the same valuation fixed in the partnership agreement as of January 1st, 1879, to wit, $140,000, the bill of sale by which the transfer was effected being signed by the three partners. It may be noted in passing that the bill of sale in terms transfers only goods and stock at Little Falls and at the store in New York, but I understand that it is conceded that in fact all the tangible assets of the firm were transferred to the corporation.

At the same time Robert Beattie, the father, made an agreement with the corporation by which in consideration of one thousand six hundred shares of the stock of the company he conveyed or agreed to convey his carpet and woolen manufactory at Little Falls and the tract of real estate whereon the same was erected, and certain lands adjoining the same "together with the water privileges and the machinery and fixtures in said factory." The agreement provided for a more formal deed thereafter to be given.

The capital stock of the corporation set forth in its certificate was $300,000, and assigned one thousand six hundred shares to Robert Beattie and seven hundred shares to each of his sons. The entire authorized stock (three thousand shares) was thus fully paid for.

It is proved beyond all question that no definite valuation of the assets of the partnership or of the real estate and water rights of Robert Beattie was made when the corporation was formed. Three hundred thousand dollars apparently was selected as a convenient amount of stock to issue, all parties recognizing that the assets conveyed to the corporation were worth a great deal more money. There is nothing, however, about the case to affect the necessary inference to be drawn that

the lands and water power of Robert Beattie were more valuable than the assets of the partnership.

The specification of the objects for which the company was formed set forth in the certificate of incorporation is as follows:

"(1) To purchase of Robert Beattie the carpet and woolen manufactory and tract of real estate whereon the same is erected and the lands adjoining the same at Little Falls, together with the water power and privileges and the machinery and fixtures in said factory.

"(2) To purchase from Robert Beattie & Sons the goods and stock in said factory and at their store No. 85 White street, New York City.

"(3) To carry on the manufacture and sale of carpets and other merchandise at said manufactory and store; to erect buildings, mills and machinery for the purposes of such manufacture; to improve and rent and sell said real estate; and to carry on any other business necessary for the proper management and development of said property."

It may be noted that the corporation was formed to purchase two very different kinds of property, and to carry on two very different kinds of business with the two kinds of property thus acquired. The company bought a carpet factory and stock of goods which had been made therein, and the certificate provided as one of the permanent objects of the corporation for the carrying on the carpet manufacturing business and the erection of "buildings, mills and machinery for the purposes of such manufacture." But the corporation was receiving lands and water privileges far beyond what were necessary for use in connection with the carpet manufacturing business, as the proofs amply show, and the certificate therefore provided as another object of the corporation that the company was "to improve, rent and sell said real estate and *to carry on any other business necessary for the proper development of said property.*"

Robert Beattie, the father, died about a month after the corporation was formed before the "formal deed" provided for in the agreement of July 6th, 1882, above mentioned had been made. This deed, however, was executed by the two sons and residuary devisees, William and Robert Beattie, and their respective wives to the corporation on March 25th, 1884, and although the instrument was duly acknowledged on April 5th, 1884, it was not recorded until February 20th, 1886. From this formal deed it appears that in fact Robert Beattie, the

father, turned over to the corporation a large number of tracts of land, aggregating four or five hundred acres at Little Falls, with all the valuable water rights which were appurtenant thereto. The deed expressly conveys all

"the right, title and interest of Robert Beattie, now deceased, to lands under water in the Passaic river, at Little Falls, and all the water power, privileges, dams, aqueducts, canals, raceways, rights to flow land, rights to maintain dams, abutments and bridges, and all rights appurtenant to his lands or mills at Little Falls."

In pursuance of the corporate objects above specified the corporation continuously from 1882 until the filing of this bill in 1906, has carried on the carpet manufacturing business at Little Falls and in New York City, and has also sold land and marketed the water privileges which Robert Beattie conveyed to the corporation upon its formation. Both branches of business seem to have been carried on with great success and have resulted in the accumulation of a very large amount of money and securities, the apparent aggregate value of which seems to make the capital stock of the corporation ($300,000) appear like rather a small figure. The corporation at all times since the death of Robert Beattie until the death of William Beattie in 1889, was under the control of the two sons, Robert and William, who were the officers of the corporation, and constituted a majority of its board of directors. After the death of William Beattie in 1889, the defendant William H. Beattie, a son of Robert Beattie, took the place of his uncle William. Since 1889 Robert and his son, William H., have had absolute control of all the affairs of the company.

Under the management of these gentlemen, the defendants Robert Beattie and his son, William H. Beattie, water privileges have been sold to the East Jersey Water Company by deed or contract for the aggregate sum of $530,000. The corporation, as one of the fruits of this water business which it has carried on, now possesses a purchase money mortgage executed by the East Jersey Water Company for $315,000, upon which the annual interest ($12,600) apparently has been paid since the execution of the mortgage in November, 1901. The corporation

also holds the agreement of the East Jersey Water Company to buy the remaining water power which the corporation controls, on or before March 23d, 1915, for the sum of $200,000.

It does not appear that this corporation has done a great deal in the way of selling or improving the large tracts of real estate at Little Falls which have no essential connection with the carpet manufacturing business, but this work, of course, the corporation may at any time undertake in pursuance of one of its corporate objects. The wide scope of the business in which the Beattie Manufacturing Company may lawfully engage under its certificate is indicated· by the clause in the certificate which authorized the company "to carry on any other business necessary for the proper management and development" of these extensive lands at Little Falls, and these exceedingly valuable water rights connected with the falls of the Passaic river at that place.

Without the aid of the considerations hereinafter set forth, it seems to me that to classify the Beattie Manufacturing Company as a "manufacturing corporation" would be inaccurate and misleading. It would be equally inaccurate and misleading, it seems to me, to classify it as a land and water right company. It is true that one object of the corporation is to carry on the carpet manufacturing business, and it would be entirely proper to describe the corporation as being engaged, among other things, in the conduct of such business, and to that extent a manufacturing corporation. In like manner the company might properly be referred to as a land company in connection with the business of selling land and water rights and privileges.

The fact that the corporate name does not indicate that the corporation was in any other line of business than manufacturing, to my mind, is of very little significance. In connection with the important name *Beattie* it was quite natural that the word "manufacturing" should appear in the title because the corporation was to continue the old established Beattie carpet manufacturing business at Little Falls and in New York. A name like the Beattie Land and Water Power Company would have been a very queer one to select for use in the carpet market of New York. On the other hand, it was not necessary to the

successful prosecution of the other great branches of the corporate business that there should be any reference to such business in the corporate title. The Beattie Manufacturing Company could negotiate for the sale of lands and water rights and privileges just as well as the original Robert Beattie, the old carpet manufacturer, could have done in his day. To add anything to the title besides what was appropriate for use in connection with the carpet business would have been useless and even inconvenient. To find out whether this corporation can properly be called a "manufacturing corporation," we must look at the objects of the corporation as specified in its certificate, and then ascertain what kind of business the corporation actually embarked in. It may be conceded for the purposes of this case that the certificate is not controlling—that the objects may be specified in a certificate, only one of which is the manufacture of goods, but if the corporation exclusively engages in such manufacture, it may be proper to term it a "manufacturing corporation."

2. We are now prepared to deal with the question which has been extensively argued, whether or not the Beattie Manufacturing Company must be deemed a "manufacturing corporation" within the meaning of section 52 of the Corporation act of 1875. *Rev. Stat. p. 186.* This section, with one significant change, which will be noticed hereafter, embodied the provisions of a statute passed in 1866 (*P. L. 1866 p. 1034*), which last-mentioned act was the first attempt in New Jersey to impose anything like a rigid mandatory rule to compel the distribution of the profits of corporations in dividends to stockholders. This statute imposed upon "all manufacturing corporations" within the state the duty of distributing profits as a dividend to stockholders on the 1st day of August in each year unless some other specific day had been fixed in the charter or by-laws. The statute of 1866 only permitted a different day to be fixed by the charter alone. The act permitted the board of directors to reserve as a working capital a sum "not exceeding the amount of one-half of the capital stock paid or secured to be paid." The remainder of the profits had to be distributed annually.

The argument has been forcibly urged that the Beattie Manufacturing Company having been formed under the act of 1875

was, when this suit was commenced, subject to this ironclad rule regulating the distribution of "accumulated profits." I cannot accept that view.

The history of the legislation in New Jersey looking toward the compulsory distribution of the profits of corporate business by dividends to the stockholders was set forth by me in the case of *Stevens* v. *United States Steel Corporation (1904)*, 68 *N. J. Eq. (2 Robb.) 373*, and also in the case of *Raynolds* v. *Diamond Mills Paper Co.*, 69 *N. J. Eq. (3 Robb.) 299*, and need not be repeated here in detail. The opinions in those cases may also be referred to as indicating the view which I entertain in regard to the practicability and wisdom of undertaking by a statute to lay down a rigid rule for the distribution of the profits of business corporations. The act of 1866 was a legislative experiment in New Jersey which subsequent enactments seem to indicate did not meet with approval or pass the test of time and experience. When at length by the revision of 1896 (section 47) this novel law was made applicable to all corporations created under the general act, the mandatory distribution of profits was modified so as to permit the corporation by its certificate or by a by-law to "give the directors power to fix the amount to be reserved as a working capital." It is a part of the history of our Corporation law that an immense manufacturing and business corporation paused in the work of organization until the statute was further amended (*P. L. 1901 p. 245*), so as to give a corporation power by its "original or amended certificate of incorporation, or any by-law adopted by a vote of at least a majority of its stockholders," to regulate the business of distributing its profits in dividends as it might see fit, subject of course to equitable control to prevent any abuse of this discretionary power. See *Stevens* v. *United States Steel Corporation, supra.* Thus the legislative policy of imposing a rigid statutory rule upon manufacturing and other corporations was abandoned, and the original rule prevalent generally was in effect re-established in New Jersey.

(1) The act of 1866, as modified in 1875, should, in my opinion, be strictly construed. This statute was an experiment and was based upon a view of corporate management which has practically been abandoned.

(2) The statute in question lays down a law to regulate the distribution of profits of a corporation derived from capital invested in manufacturing business. Where the capital of a corporation to any considerable extent is invested in some other kind of business, either the statutory rule becomes entirely inapplicable, the case not being within the statute at all, or the law, according to its spirit, should be obeyed by apportioning the profits between the two radically different kinds of business and subjecting one part of the profits to distribution under the ironclad rule of the statute, and leaving the rest of the profits under the control of the directors. If the statute had been intended to operate in this way such intention would probably have been expressly declared. In the case of the Beattie Manufacturing Company a very large part of the original capital and surplus with which the company began business seems to have consisted of property not used or intended to be used in the carpet manufacturing business. Is it possible that the statutory rule was made applicable to a corporation with a capital of $10,000,000, nine hundred and ninety-nine thousandths of which was invested in various enterprises not connected with any manufacturing business, if one of the corporate objects consisted in operating a shoepeg factory in which not more than $10,000 was invested or was intended to be invested?

Very soon after the statutory rule was made applicable to all corporations, as we have seen, the whole force of the rigid rule was abolished. In my opinion, the hard and fast rule of the Corporation act of 1875 should be strictly limited to corporations whose capital, in its substantial entirety at least, is invested in manufacturing, and therefore the rule never was applicable to the Beattie Manufacturing Company.

3. If the Beattie Manufacturing Company must be deemed to be a manufacturing corporation within the meaning of the act of 1875, that act, after a series of modifications, was repealed and displaced by the act of 1901.

4. It is not contended on behalf of the complainants that the by-laws with which we have to deal were not adopted by a majority vote of the stockholders so as to bring them within the

operation of section 47 as amended in 1901. The evidence seems to show that the by-laws were adopted unanimously.

The first by-law passed upon the organization of the corporation in 1882 is as follows:

"Dividends shall be declared and paid semi-annually in the months of January and July of such portion of profits as the directors shall deem advisable."

If the Beattie Manufacturing Company was a "manufacturing corporation" within the meaning of section 52 of the act of 1875, we certainly have here a most flagrant disregard of the rule laid down by that statute in relation to the distribution of profits in dividends. This by-law was acted upon from year to year without protest from any stockholder.

In the year 1900 the following by-law was adopted:

"The directors may determine from time to time the amount to be reserved by the corporation as working capital."

This by-law manifestly was adopted pursuant to section 47 as it appeared in the revision of 1896. Under this by-law thereafter the directors regularly by resolution declared a dividend and directed that "the residue of the accumulated profits of the company be reserved as working capital." If the statute of 1896 became applicable to this corporation, the only question in regard to the accumulated profits after the adoption of this by-law in the year 1900 would seem to be confined to the *bona fides* of the directors in doling out $30,000 to the stockholders as dividends and keeping back $150,000, or $200,000 of cash in the banks by calling this idle money "working capital." It is plain that section 47 was amended in 1901 so as to narrow the control of the court of chancery over the boards of directors of corporations in respect of the distribution of profits to stockholders. Under the law of 1901 directors are not obliged to set off profits as working capital in order to retain the same from distribution; where corporations avail themselves of this last form of our statute, it would seem that the jurisdiction of this court stands just where it did before any of this experimental legislation was attempted. The court still has full power to prevent an abuse of discretion and compel

the distribution to stockholders of profits which are unreasonably withheld.

5. My conclusion is that section 52 of the act of 1875 was never applicable to the Beattie Manufacturing Company, and that if it was applicable in 1882, it was repealed and substituted by subsequent laws which the legislature had the constitutional right to pass.

My further conclusion is that under the by-laws of the corporation and the provisions of the present General Corporation act, as amended in 1901, the whole matter of distributing profits as dividends is within the sound discretion of the directors.

6. If any of the views expressed above are erroneous—if the act of 1875 is the law governing the Beattie Manufacturing Company, the complainants have all their property as stockholders in their stock, and, in my judgment, after these many years of acquiescence in the policy of the corporation, they should be allowed to enforce their right in a court of equity to receive their share of the profits in the form of cash dividends only to an extent which will not increase the burden and inconvenience of the corporation. If we admit that the Beattie Manufacturing Company is a "manufacturing corporation" within the meaning of the act of 1875, and that the rule in respect of the distribution of the profits imposed by that act is unalterable by the legislature, or if we assume that this corporation is not a manufacturing corporation, and hence was not within the operation of the act of 1875, but that it was not competent for the legislature in 1896 or in 1901 to materially alter the existing law under which the corporation was formed in regard to the distribution of profits in dividends, or whether we hold that these recent statutes of 1896 and 1901 successively became applicable to the corporation, the practical result for all present purposes, in my judgment, is substantially the same after this long period of delay and acquiescence. The stockholders can only get the aid of this court to compel the distribution to them of profits which exist in the form of cash, or which can be readily converted into cash, and which the corporation does not reasonably require for the continuation of the successful business of all kinds in which at the present time it may lawfully be engaged.

In this case, as well as in prior similar cases, which have come before this court, the complainants recognize most fully in their bill the practical difficulties in the way of strictly enforcing their alleged rights under these statutory rules for the distribution of profits in dividends. The bill does not invoke the statute (section 52 of act of 1875) and demand under that statute a distribution of "accumulated profits" according to the rule therein laid down. The bill prays that the corporation "be decreed to declare a dividend of all the net earnings and accumulated profits of the said company," which shall appear to be "not needed for the legitimate purposes of the company's business." The bill also prays that the decree may compel the declaration of "such reasonable dividends" from time to time as the "financial status of the business may warrant." Counsel for the complainants state in one of the briefs that the three principal complainants, Miss Beattie, Mrs. Gedney and Mrs. Murray, "do not ask to have withdrawn from the business and distributed among the stockholders as dividends any more of the accumulated profits than can with due regard to the best interests of all the stockholders be properly withdrawn." This would seem to be substantially a statement of the original equitable rule in regard to the power of this court to compel the corporation to distribute profits unreasonably withheld.

It was necessary, however, in my judgment, to determine the law applicable to the present situation. Counsel for complainants have argued that the law of 1875 governs this case. What the bill says and what counsel say in their briefs and arguments only go to establish a formal waiver by which the extent of the remedy which the complainants seek in this court at the present time may be modified and limited. The complainants stand in court asserting a very wide right under the statute of 1875 which they allege to be irrepealable as to them by the legislature, but they voluntarily waive the enforcement of all these rights in the interest of their corporation to the extent which they think is promotive of their present interests. The decree will not be based on any such theory of waiver.

7. So far the complainants have been considered as ordinary legal stockholders. Such, however, is not the case with respect

to all of them. One complainant, Alexander Murray, is the legal owner of twenty-five shares of stock, and another complainant, Mary Murray, is also the legal holder of twenty-five shares. The great bulk of the stock of this corporation in which the complainants are interested is held in trust as follows: Three hundred shares in trust for the complainant Mary Murray, three hundred shares in trust for Agnes Beattie, and three hundred and fifty shares in trust for Josephine Gedney. These three ladies are daughters of the original Robert Beattie, who died in 1882, and this stock aggregating nine hundred and fifty shares was bequeathed by Robert Beattie to his executors in trust. The legacy in trust for the complainant Mary Murray is in the following language:

"I give my said executors three hundred shares of the stock of the Beattie Manufacturing Company in trust to pay the income and dividends thereof from the date of my death to my daughter Mary Murray for her life, and on her death I give the said shares to her issue, if any; if none, to her heirs-at-law, to be divided among such heirs in the same proportions as real estate of which she might die seized would descend."

The trust legacies for the complainants Agnes Beattie and Josephine Gedney, respectively, are in the same words, excepting that the name of the beneficiary is different, and in the case of Mrs. Gedney the amount of the stock is fifty shares more than the amount allotted to either of her sisters.

The executors of the will of Robert Beattie, deceased, were his two sons, Robert and William, and his two sons-in-law, William Dickson and Edward Gedney. The son-in-law William Dickson is an aged man entirely blind who acts as a third director with Robert and William H. Beattie. The control of Robert Beattie over the voting power of the stock of which these trustees are the legal holders seems to have been complete.

There are two points requiring consideration connected with the nature and situation of these holdings of stock in trust.

(1) Counsel for complainants in their arguments deal with these beneficiaries, the complainants, Miss Beattie, Mrs. Murray and Mrs. Gedney, as if they were the legal stockholders with whom the corporation sustains relations and whose rights the corporation is bound to protect. It seems to me that this is not the

correct view. A corporation charged with withholding dividends or otherwise impairing the rights or injuriously affecting the interests of its stockholders is confronted with a question between itself and its legal stockholders. If these legal stockholders are trustees bound to pay over all dividends to some beneficiaries who are strangers to the corporation that is their affair. The corporation, in my judgment, is only liable to such extent as all persons are liable who deal knowingly with trustees to the injury of beneficiaries. The complainants in respect of the nine hundred and fifty shares of stock held in trust do not have the full status in this court of stockholders of the Beattie Manufacturing Company. If the complainants' trustees—the legal stockholders—have been guilty of negligence or fraud in failing to secure the distribution of more profits as dividends during all these years, these complainants have their appropriate equitable actions for relief. This present suit on the part of these beneficiaries is not brought against the trustees to compel them to account for their mismanagement of the trust estate in their hands; it is brought against the corporation as the principal defendant to compel the corporation to distribute dividends which the trustees as stockholders have prevented the corporation from so distributing.

The situation of corporations would be hard indeed if they had to act or refrain from acting not only with their stockholders in view, but also with regard to the interests of all the beneficiaries of the stock held in trust under wills or deeds.

(2) The second point to be considered relates to the inability of the controlling directors of this corporation to deal impartially and fairly with this stock held in trust with respect to the declaration of dividends.

The defendant Robert Beattie, one director, holds over seven hundred shares of the stock of the corporation, and the defendant William H. Beattie, another director, holds two hundred shares. As the accumulation of profits increases their shares not only become more valuable but such additional and increasing value remains their property. Not so with the stock of their sisters Agnes Beattie and Josephine Gedney who are over fifty years of age and without issue. Upon the death of either of these sisters without issue, the defendants above named, or their

children, will receive a substantial portion of the shares held in trust under the terms of the will creating the same. I think it is quite plain that the power of a court of equity to intervene in a case like this and control a corporation in respect of the declaration of dividends, thus setting aside the discretionary power of the directors in the premises, may be safely based upon the incapacity of these corporate managers to act fairly where they have so large a selfish interest at stake.

8. Under the original law of the state and under the present Corporation act as amended in 1901, the rule still obtains, as we have seen, that while the distribution of the profits of a corporation in dividends is largely within the discretion of the directors, a court of equity will intervene and compel a distribution of profits which have been unreasonably and improperly withheld. See authorities cited in *Stevens* v. *United States Steel Corporation, supra* (at *pp. 337, 378*).

The control over dividends by the directors of a corporation obtainable through a by-law pursuant to the provisions of section 47 as amended in 1901, is plainly subject to this well-settled rule of equity.

9. The case under consideration is one where this court in my judgment should intervene to compel the distribution of a large amount of the accumulation of profits which for a long period of time have existed as cash on deposit with bankers or in a trust company.

I have already pointed out the very substantial selfish interest of the directors which naturally inclines them to keep back dividends and let the accumulated profits add value to the stock. This disqualifying interest upon a slight showing of actual hardship and unfairness might justify intervention by a court of equity. But the proofs in this case establish beyond a shadow of doubt that for years there has been an accumulation of the profits of this corporation in money drawing a low rate of interest. The dividend of late has been ten per cent. per annum. Thus $30,000 a year has been distributed while it is perfectly plain that the dividend often might have been doubled without having any other effect upon the corporation or its business than to diminish these huge deposits in the banks. The only attempt

worthy of consideration made by the defendant directors to justify this enormous piling up of profits in money, was put forward by Mr. William H. Beattie to the effect that such accumulation of money enabled the corporation to guarantee for the future the payment of ten per cent. dividends. Inasmuch as directors of corporations engaged in endeavoring to make money for stockholders are not charged with the duty of guaranteeing stated incomes to the shareholders, and are charged with the duty of honestly paying out all profits which the corporation does not require for its own use in the corporate business, the excuse of this director need not be further considered.

The proofs do not show that the Beattie Manufacturing Company is engaged in erecting buildings or in improving land, or using capital in carrying on any business not connected with manufacturing which is permissible under its charter, nor does it appear that the corporation is contemplating engaging in any such work. If the corporation should spend $40,000 or $50,000 in the erection of a new power plant to take the place of the water which has been cut off or will be cut off on or before 1915, the evidence shows that after allowing for this extraordinary disbursement a large dividend could still be paid without injuriously affecting the corporation in any way.

The principle upon which the extent of the dividend should be ascertained presents some questions which call for careful consideration. The company at the start no doubt had a large surplus vested in it by the contributions of the assets of the firm of Robert Beattie & Son, and of the lands and water rights of Robert Beattie. The capital, however, was fixed at $300,000 only. It was one object of the corporation to improve and sell a very large tract of real estate, and this included the sale of the water rights which already has been affected for the sum of $530,000. The view which I have taken of the relation of the present and former New Jersey statutory law to this present controversy seems to make it unnecessary to undertake a definition of the term "profits" or "accumulated profits" where the corporation starts out with a large surplus invested both in a manufacturing business and in lands and the water power which it holds for sale. The surplus itself plainly cannot be classified as profits. As the

surplus was to be handled, rented, improved and otherwise dealt with by the corporation, profits thereon undoubtedly might be made.

It seems to me to be safe to hold that in this case the entire surplus invested in lands and water rights was practically vested in the corporation in trust to sell and divide the net proceeds among the stockholders. It is true that the corporation is authorized by its certificate to improve and rent the real estate and to carry on business other than manufacturing which may be "necessary for the proper *development*" of said property. The corporate objects seem to include the sale of this real estate, and naturally power was given to rent, to improve and to develop such real estate.

Of course creditors could require the capital to remain intact for their protection, and the law forbids the distribution of the capital to the stockholders.

As to this large surplus, although not to be classified with "accumulated profits" the stockholders, in my judgment, in a case like this have equities which correspond with their equities in respect of profits unreasonably retained from distribution, and which the directors are bound to recognize and can be made to recognize by the decree of this court. If by December 1st, 1918, when the mortgage for $315,000 falls due the entire $520,000 due from the East Jersey Water Company has been paid to the Beattie Manufacturing Company in cash, can there be any doubt that a court of equity would not allow this corporation to hold indefinitely this large sum of money deposited in banks or otherwise invested and drawing three and one-half per cent. or four per cent. interest? Is it not plain that the court would hold such action as a gross abuse of discretion, in fact a violation of fiduciary obligation for which courts of equity always afford a remedy?

One object of this corporation was to make money by manufacturing carpets, and another object was to sell these valuable lands and water rights. As this conglomeration of business proceeds the money realized (always having in view the preservation of the capital) belongs in equity to the stockholders for whose pecuniary advantage the whole enterprise was conceived

and established in 1882. It is not necessary to question how far the directors could keep all this cash as a part of an undistributed surplus or undistributed profits by erecting blocks of buildings and embarking in various lines of business which they might deem "necessary for the proper management and development" of the property committed to their charge. This corporation has engaged in no such project. It holds this mortgage for $315,000 and collects the annual interest thereon of $12,600, nearly half the annual dividend which they have arbitrarily fixed as the amount which the stock is to receive.

The mortgage for $315,000 and the obligation of the East Jersey Water Company to pay $200,000 form no part of what is now distributable in dividends. If the complainants could show that the corporation could sell this mortgage without recourse and realize the amount thereof in cash, the situation would be very different. As the case stands it may be that no portion of these principal sums aggregating $515,000 will ever be collected while the water rights sold for that sum may revert to the corporation and be offered in the market in some form or for some purposes again.

The amount of the dividend to be declared will, of course, depend upon present conditions. A substantial amount of cash which I find is unreasonably withheld can be distributed—not necessarily on the date of the decree in this cause—without affecting injuriously the interests of the corporation.

The mode of ascertaining the amount of the dividends now to be declared and fixing the time and conditions under which the same shall be paid, may be determined on settlement of the decree.

10. The charge that the salaries of the managers (at one time, I think for a brief period, $10,000 a year each, and recently $8,500 each) are excessive is not sustained, it seems to me, by a review of the facts which have already been considered in disposing of the more important issue in this cause. The question is whether the management of this corporation as a whole, by the defendants Robert and William H. Beattie, is worth the money which they have paid themselves for such service. It is not denied that they have operated a large manu-

facturing business with very great success, and that they have marketed over half a million dollars worth of water rights in the accomplishment of which business no doubt skill and energy and persistent negotiation must have been necessary. These men are not to be paid as if they were clerks. It appears that practically their whole time has been devoted to the business of the corporation which has grown under their hands.

It has been urged that there were certain specific instances of misfeasance or misappropriation of property disclosed by the testimony for which these defendants are responsible, and the argument is made that their salaries should be reduced if not forfeited with such facts in view. No issue of forfeiture or mismanagement is raised by the pleadings. The bill merely charges that these defendants have paid themselves "annual salaries far in excess of the true or fair value of the services actually rendered," that the duties performed "are very light and insignificant," &c. The prayer of the bill is that the "fair value of the services annually rendered" by Robert and William H. Beattie be ascertained by the court, and that these defendants "may be decreed to restore" what the court "may find to have been an excessive amount drawn by them in respect of such salaries." If there is any set off against the true value of the services rendered by these officers and agents of the corporation growing out of mismanagement or misappropriation of corporate property, such a set off must be established by a distinct issue either in this suit or in some other suit. It would be grossly unfair to permit the complainants to go through this mass of testimony and pick out fragments upon which to construct and sustain a charge of mismanagement against these defendants, and then ask the court to convict them, assess the damages and deduct the same from the amount of the salaries found by the court to be reasonable and just. Of course, if we had to deal with a charge that the corporate managers have been persistently negligent so that their whole general management has been unprofitable, the case would be quite different, but even then it would be fair to have the bill of complaint disclose to the defendants that such issue was to be tried.

The complainants, Miss Beattie, Mrs. Murray and Mrs. Gedney, the three beneficiaries were produced as witnesses to testify to the effect that they knew little or nothing of the business of the corporation, but they were not asked whether they knew the amount of these salaries which from year to year had been received by Robert and William H. Beattie, and gave no testimony in regard to this matter. The natural inference is that these ladies knew what their brother and their nephew were receiving during all these years, and it is not claimed that they ever made any protest or objection of any kind. The same inference is proper in the case of the remaining complainant, Alexander Murray, who holds only twenty-five shares of stock and who gave no testimony in the cause.

Upon the whole case I cannot find that the compensation of these defendants has been excessive. Whether they are liable to their corporation for any specific acts of misfeasance, is a question which is not considered in this case. The salaries of the Messrs. Beattie for the present will be fixed at the sum which they have been actually receiving during the last few years, viz., $8,500 each.